UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| George McBeth, Sr., as Personal Representative for the Estate of Jackie McBeth, | ) ) ) ) | Civil Action No. 7:15-1473-BHH |
| Plaintiff, | ) ) | **Opinion and Order** |
| vs. | ) ) | |
| City of Union, David Taylor, Wendy Childers, Brandon Vaughn, James Johnson, Roger Hill, and Roger Suber, | ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

This matter is before the Court on Defendants' David Taylor, Wendy Childers, Brandon Vaughn, James Johnson, Roger Hill, and Roger Suber's (collectively "Defendants")[1] motion for summary judgment. (ECF No. 69.) For the reasons set forth in this order, Defendants' motion is granted in part and denied in part.

## BACKGROUND

Plaintiff George McBeth, Sr., as personal representative for the estate of Jackie McBeth ("Plaintiff"), pursuant to 42 U.S.C. § 1983 ("§ 1983") and the South Carolina Tort Claims Act ("SCTCA"), asserts three causes of action against the Union County Sheriff's Office (Sheriff David Taylor is sued in his representative capacity), and two causes of action against five Sheriff's deputies[2]—Wendy Childers, Brandon Vaughn,

---

[1] Defendants Kevin Powers, Scott Hood, Cedric Dunn, and Douglas Spencer were previously dismissed, with prejudice, by stipulation on September 22, 2017. (*See* ECF No. 66.)

[2] For ease of reference and understanding, the Court will refer to all subordinate employees of the Union County Sheriff's Office by the term "Deputy"—as distinct from "Officer," for employees of the City of Union Police Department—even though that term may not comport with their official rank, such as "Corporal," "Sergeant," etc.

James Johnson, Roger Hill, and Roger Suber—in their individual capacities. (*See* Compl. ¶¶ 4, 6, 15-33, ECF No. 1.) The parties dispute whether the complaint also states a cause of action, under § 1983, against David Taylor in his individual capacity for maintaining a municipal policy and/or custom and practice that fails to train deputies in the appropriate procedures for taking mentally ill citizens into custody. (*See* Defs.' Reply, ECF No. 92 at 10; Pl.'s Sur-Reply, ECF No. 94 at 1-4.) These claims arise out of the death of Jackie McBeth ("McBeth"), Plaintiff's son, on April 10, 2013, while in police custody.

The facts leading up to the restraint of McBeth are not in material dispute. On April 10, 2013, McBeth was driving a vehicle in the City of Union, South Carolina, when he struck the rear of another vehicle and a collision occurred. McBeth received a blow to his head during the collision, which potentially contributed to his apparent state of mental confusion. McBeth's brother, George McBeth, Jr., was a passenger in the vehicle driven by McBeth and was knocked unconscious. Shortly after the collision occurred, Officer Scott Hood of the City of Union Police Department ("CUPD"), was travelling on Highway 176 toward Hart Street and received a call from dispatch about the collision. Officer Hood was in the process of beginning his investigation and understood there was a subject who was unresponsive in the parking lot of a convenience store. Officer Hood asked for EMS to be dispatched and observed Officer Kevin Powers of the CUPD driving through the intersection of Highway 176 and turning onto Hart Street.

After turning onto Hart Street, Officer Powers observed McBeth, a black male weighing approximately 255 pounds, on top of a white male subject, repeatedly hitting

the subject in the head. Officer Powers exited his vehicle to intervene and a struggle ensued between McBeth and Powers. Officer Powers noted that McBeth did not appear to be in his right mind because of the expression on his face and the look in his eyes. Prior to the physical confrontation, McBeth was also observed engaging in inexplicable behavior at the scene, such as punching the window of a truck parked nearby, and quoting random scripture passages from the Bible. Officer Powers used his Taser (in probe mode), which had no appreciable effect on McBeth, and attempted to use Freeze + P spray, which McBeth blocked with his hand. The struggle between Powers and McBeth was ongoing when Officer Hood came to Powers' aid and attempted to control McBeth. Officer Hood deployed his Taser (in probe mode) on McBeth, jumped on McBeth from behind, and placed his arm around McBeth's neck, pulling him off of Officer Powers and to the ground.

At this point, Officer Powers' dash cam video ("Powers Video") begins to record some of the struggle.[3] (*See* Powers Video, ECF Nos. 87-31.) McBeth, Powers, and Hood appear in the lower left corner of the screen at timestamp 2:00 of the video. (*Id.*) The utility of the video is limited, however, by the fact that the hood of the police cruiser blocks view of the area on the ground where the three men are struggling. At first, McBeth is face down to the ground, whether laying on his stomach or attempting to crawl, with the two officers on top of him trying to restrain him. (*Id.*) Officer Powers deploys his Taser (in drive-stun mode) on McBeth numerous times—by his own

---

[3] A helpful summary, albeit from Plaintiff's perspective and including some inferences drawn by counsel, of the series of events depicted in the three available videos (ECF Nos. 87-30, 87-31, 87-32) can be found at exhibit 28 to Plaintiff's opposition. (ECF No. 87-29.) The timeline provided in the exhibit cross-references the events as they happen in the videos from different vantage points, and itemizes them by their corresponding timestamps. The timestamps of the videos are idiosyncratic and have no relationship to one another, or to the actual time of day that the events occurred.

description, "every time [McBeth] tried to get up." (*See* Powers Dep. 29:8-30:14, ECF No. 87-7 at 4-5.) At 3:51 of the Powers Video, McBeth's leg is raised into the air, and the position of his foot indicates that he is now on his back. (ECF No. 87-31.) Officer Powers was able to handcuff McBeth with his hands in front. (Powers Depo. 30:18-31:16, ECF No. 87-7 at 5-6.)

The parties dispute the manner and degree of force used by police in restraining McBeth, and which officers and deputies were actually involved in physically restraining him. As already noted, certain aspects of the incident are captured on video. Eventually, Powers and Hood together subdued McBeth in a supine position, with Powers leaning his body weight on McBeth's upper legs and abdominal region (where McBeth's hands are shackled), and Hood laying parallel to McBeth, their heads side-by-side, their feet facing away from each other, Hood's left arm underneath McBeth's head and wrapped around the side and front of McBeth's neck along his jawline,[4] Hood's right hand intermittently grasping his left hand/wrist to brace the neck hold being applied by his left arm. The relative positions of Powers, Hood, and McBeth can be seen in a cellphone video, recorded by a bystander. (*See* Cellphone Video, ECF No. 87-30.) The bystander appears to know McBeth, and she comes over and attempts to calm him down by speaking to him, telling him not to move, and asking what is wrong with him.[5] (*Id.*) At 0:40 of the cellphone video, Officer Hood is seen maintaining his headlock hold on McBeth, Officer Powers is seen laying on McBeth as described, and Deputy Wendy

---

[4] In their statement of the facts, Defendants inexplicably assert, "**Hood's arms were not on or across McBeth's neck or throat** and McBeth was still talking and screaming with [sic] the head restraint was applied by Officer Hood." (ECF No. 69-1 at 7.) This assertion is clearly contradicted by the video evidence.
[5] The bystander calls McBeth by his twin brother's name, "George," and refers to herself as "Auntie."

Childers is seen leaning over McBeth with her hands on his chest.[6] (*Id.*) At 7:45 of the Powers Video (roughly corresponding to 2:50 of the cellphone video), Deputy Roger Hill approaches McBeth with leg irons and bends down to put them on McBeth's legs with Deputy James Johnson's assistance. (ECF No. 87-31.) Hill and Johnson stand up at 8:15, apparently having completed the fixture of the leg irons. (*Id.*) From 0:58 to 3:10, the cellphone video shows a more detailed view of the hold that Officer Hood is applying, the pallor of McBeth's skin, bruising and blood on his forehead, the state of his breathing and speaking, and fluid coming out of the side of McBeth's mouth that appears foamy in substance. (ECF No. 87-30.) At 3:10 of the cellphone video (8:15 of Powers Video), Officer Powers stands up and backs away from McBeth. Officer Hood releases his hold and stands up at 3:20 (8:33 of Powers Video). McBeth is observed speaking, and at times shouting, nonsensical things through the remainder of the cellphone video, which concludes at 4:06 (roughly corresponding to 9:12 of the Powers Video). (*Id.*)

At various points throughout the Powers Video it appears that McBeth struggles to move around again after both his hands and feet are shackled and Officers Powers and Hood have stood up and backed away. Although the view of his body is blocked by the hood of Powers' police cruiser, different groups of officers/deputies can be seen bending over McBeth, both to check on him and to restrain him. It is not immediately apparent which officers/deputies restrain him at various times—because they are often off camera—or what type/degree of force is being applied. For example, in his sworn

---

[6] This moment roughly corresponds to timestamp 5:40 of the Powers Video. However, Deputy Childers is first seen bending over McBeth, and apparently placing her hands on his chest, at 4:48 of the Powers Video. At 5:12 of the Powers Video, Deputy Suber appears and places his hand on Officer Powers' back. There is no way to judge how much weight Suber is placing on Powers' back, except by drawing an inference.

statement on the day of the incident, Deputy Suber describes Officer Douglas Spencer of the CUPD as taking Officer Powers' place on top of McBeth once Powers got up, and indicates further struggles to restrain McBeth:

> As Officer Dunn and several family members was [sic] trying to comfort him, the male subject attempted to raise his body off the ground. **I layed [sic] myself on Officer Spencer's back to put some more weight on him in an attempt to keep him on the ground, to keep from causing harm to himself or the public.[7] He tried this a couple of times.** Then the subject began to spit. I got off of Officer Spencer and I helped Officer Dunn pull the subject's t-shirt over his face. Deputy Taylor gave me a spit mask and I placed it over his head as Officer Dunn held his head in place.

(ECF No. 87-23 at 2 (emphasis added).) However, the events that Deputy Suber describes with some specificity cannot be observed in the Powers Video, because of the blocked view. It is clear that the struggle continues to be intermittently vigorous, because the officers' bodies can be seen rocking back and forth as they attempt to restrain McBeth, and the quickness of their movements toward McBeth at times conveys their sense of urgency to restrain him (e.g., 9:53, 12:09, and 13:10 of the Powers Video). (*See* ECF No. 87-31.)

The Court notes that, with respect to the video evidence, it exclusively relies on the Powers Video and the cellphone video to reconstruct approximately the first half of the incident, because nearly all of the relevant events are initially out of frame on the dash cam video from Deputy Hills' police cruiser ("Hill Video"). (*See* Hill Video, ECF No. 87-32.) However, at 18:05:05 of the Hill Video, officers and deputies can be seen scrambling to restrain McBeth. Neither McBeth's position (prone or supine), nor the degree/type of force being applied to his body can be observed. (*Id.*) At 18:10:08, Deputy Hills' dash cam is adjusted to point directly at the scene, and EMS personnel

---

[7] Officer Spencer stands 6'2", and weighs 309 lbs.; Deputy Suber stands 5'11", and weighs over 300 lbs.

can be seen bending over McBeth and subsequently taking CPR measures and providing oxygen (18:10:45). (*Id.*)

The Court is unclear why Defendants, in their briefing, represent it as established fact that McBeth is in a supine position for nearly the entire duration of the struggle. (*See, e.g.*, 69-1 at 5 ("He was kept on his back throughout the entire incident except for possibly some brief moment in time when he tried to turn over.").) After the cellphone video concludes, McBeth's body position cannot be seen until he is unresponsive in the Hill Video. Moreover, Deputy Childers, in her sworn statement taken the day following the incident, describes McBeth turning over to the prone position sometime after the leg irons were in place:

> Cedrick Dunn arrived and knew the subject and stated that "I got him." So, I let go and let Dunn try to calm the subject down. The subject then began spitting blood at Dunn and other officers. Someone handed Dunn (I think it was Dunn) a surgical mask to place over the subject's mouth to prevent him from spitting. Jamison Taylor stated that he had a "spit mask" and retrieved it from his car.[8] Someone placed the mask on the subject. During this, a crowd had gathered, some family members of the subject. They attempted to talk to him to calm him down but that didn't work, he continued to rant about Jesus. One of the family members, I believe it was the subject's sister began to yell and cuss at a fireman. I placed her under arrest and asked Branden Vaughn to transport her to the jail. **I looked back and saw that the subject was still resisting and that several officers were trying to keep him from getting up. He resisted their efforts to keep him still and turned over from his back to his stomach.** I then heard officers request that EMS hurry up. EMS then began CPR.

(ECF No. 87-24 at 3.) Deputy Johnson, in his sworn statement taken the day after the incident, also describes a significant struggle with multiple officers/deputies while McBeth was facedown:

---

[8] Though both Deputy Johnson and Deputy Childers refer to a "Deputy Jamison Taylor," who is not a defendant in this case, as being the source of the "spit mask," Deputy Hill is seen at 10:45 of the Powers Video bringing a surgical mask to the location of the struggle and handing it to Officer Dunn (wearing white gym shorts and a sleeveless t-shirt), who is near McBeth's head area. (ECF No. 87-31.)

The suspect was very strong and continued to kick and spit until a spit mask was placed over his face by [Officer] Dunn. A set of handcuffs were placed between his boots securing them together. They were not around his ankles but attached to the insides of the boots by what appeared to be a strap. Then I stood on the center of the leg iron chain to keep his legs down. **At this time there were at least 5 or 6 officers attempting to get him under control and he was still able to flail and buck them off. Then he stopped moving completely. We called out for EMS who had arrived on the scene. We rolled him over back onto his back**, then moved back to allow EMS to take over.

(ECF No. 87-25 at 3.)

Per his deposition testimony, Sheriff Taylor arrived at the scene at some point during the struggle to restrain McBeth and observed Officer Hood applying a restraint hold to "his head." (*See* Taylor Dep. 53:3-56:16, ECF No. 87-9 at 23-26.) At 10:57 of the Powers Video, Taylor walks into camera view and begins talking to a bystander before coming over to observe the officers and deputies restraining McBeth. (ECF No. 87-31.) The Powers Video reflects that Officer Hood is not personally restraining McBeth at this particular moment, because Hood walks through the frame at 11:11-11:15, just when Sheriff Taylor comes over to observe. (*Id.*) Deputy Brandon Vaughn arrived at the scene and was attempting to communicate with McBeth, when McBeth spit up blood and saliva on him. (*Id.* at 11:39-11:49, 12:36-12:38 (Vaughn can be seen wiping off his uniform shirt and face).) Deputy Vaughn did not know whether McBeth intended to spit on him, but it led directly to the surrounding officers and deputies placing the spit mask on McBeth. (Vaughn Dep. 14:1-15:25, 20:1-4, ECF No. 87-12 at 5-7.) EMS personnel can be seen in the foreground talking to Deputy Hill while looking down at McBeth, and Deputy Johnson appears to direct EMS to check on Deputy Powers, who is sitting in the passenger seat of his police cruiser. (*Id.* at 11:49-12:02; Hill Video 18:03:36-18:03:53, ECF No. 87-32.) Sheriff Taylor bends down over McBeth's leg area and apparently

adjusts the manner in which they are shackled, because he is passed another set of handcuffs and can be seen doing something to McBeth's legs with Deputy Hill. (Powers Video 12:25-12:54, ECF No. 87-31.)

During the ensuing several minutes, Deputy Johnson, Sheriff Taylor, Officer Spencer, Deputy Suber, and Officer Hood can be observed exerting various degrees of force to restrain McBeth. (*Id.* at 13:07-18:00.) McBeth's body cannot seen, so the precise manner and position of restraint is difficult to determine. However, a combination of Defendants' statements, Defendants' deposition testimony, and the Powers Video reveal the following restraints, at minimum, as being applied intermittently: (a) laying on McBeth's upper body (Spencer), (b) laying on top of another officer to restrain McBeth's upper body (Suber), (c) grabbing and/or laying on McBeth's legs/lower body (Taylor and Hood), (d) leaning on McBeth's legs/lower body and standing on the leg restraints (Johnson). (*Id.*; Taylor Dep., ECF No. 87-9 at 31; Johnson Dep., ECF No. 87-11 at 14-16; Suber Statement, ECF No. 87-23; Childers Statement, ECF No. 87-24; Johnson Statement, ECF No. 87-25. *See also*, Hill Video 18:05:08-18:10:08, ECF No. 87-32.) Deputy Hill is standing in the near vicinity throughout this portion of the incident, looking down at the struggle from different vantage points. After several minutes, McBeth suddenly becomes unresponsive. Sheriff Taylor is talking with a bystander when he realizes something is wrong and begins sharply motioning and calling for EMS personnel. (Hill Video 18:08:15-18:08:37, ECF No. 87-32.) Plaintiff asserts that the surrounding officers/deputies turn McBeth over from a prone position onto his back at 18:09:54 of the Hill Video (*see* Video Timeline, ECF No. 87-29 at 14), which is a plausible interpretation of the body language of Deputy Johnson and an

unidentified Sheriff's Deputy (with cap and sunglasses strap) next to him. (*See* ECF No. 87-32;[9] *see also* Powers Video 17:56-18:00, ECF No. 87-31.[10]) EMS personnel respond, check McBeth's vital signs, perform CPR, and administer oxygen, but they are unable to revive McBeth. (*See id.* at 18:09:15-18:14:00.)

Plaintiff's medical expert, Nicholas Batalis, M.D. ("Dr. Batalis"), is a forensic pathologist for the Medical University of South Carolina. Based on his review of the autopsy, the officers' and deputies' statements, and the videos of the incident, Dr. Batalis opined that McBeth died as a result of restraint asphyxia while being subdued by police officers. (Batalis Report, ECF No. 87-27.) In his report, Dr. Batalis wrote:

> Adding to the hypoxic state the decedent was experiencing [from the choke hold depicted in the cellphone video] was the fact that there were officers piled on top of the decedent's torso. While this is suggested in the videos, as one can see several officers in the vicinity of the decedent, one cannot definitively determine the number of officers and their precise positions because of the obstructed camera views. However, witness statements, including those from officers, state that there was more than one officer on top of the decedent's torso. Excessive weight on the decedent's torso would further exacerbate his inability to breath as his chest would not be able to move as needed with each breath.

> Taken together, there were three significant forces acting on the decedent that significantly affected his ability to breathe and properly oxygenate his tissues—1) Occlusion of the nose and mouth by a dampened spit hood along with a shirt and/or surgical mask, 2) a significant choke hold that resulted in marked, confluent hemorrhage in his neck musculature, and 3) excessive weight on the decedent's torso impairing his mechanical ability to breath normally. Further evidence for the extent of the asphyxia is the extensive amount of pulmonary edema the decedent exhibited. The foam seen exuding from his mouth in the cellular phone video is fluid from the lungs that made its way up the airway and out the mouth. This is corroborated by the autopsy report that noted markedly heavy lungs (approximately twice as heavy as expected) with increased pulmonary

---

[9] Though the events are mostly off camera in the Hill Video, Deputy Johnson is seen raising his leg to get it off the leg irons, then bending down along with the unidentified Sheriff's Deputy as if to grab something and stepping forward

[10] In the Powers Video, Officers Dunn and Spencer appear to reach over and turn McBeth's torso, while Deputy Johnson appears to assist by turning McBeth's legs.

edema and frothy fluid. While there are other causes of increased pulmonary edema, such as use of opiate narcotics and heart failure, the presence of increased edema in this case would certainly support a diagnosis of asphyxia.

(*Id.* at 7-8.) Dr. Batalis further opined that the manner of McBeth's death is best medically described as a homicide, not an accident, because his death was directly due to, or as a consequence of, the actions of others. (*Id.*; Batalis Dep. 149:1-23, ECF No. 87-8 at 29.)

Plaintiff's use of force expert, Mel Tucker, was formerly the police chief of four separate cities in the states of Florida, Tennessee, and North Carolina. Based on his review of the evidence, established knowledge in the law enforcement community in 2013 about the risks of positional asphyxia, and established training norms in the law enforcement community in 2013 about the physiology of a struggle, Mr. Tucker opined:

The restraint of Jackie McBeth, by the officers for approximately 10 to 15 minutes with his hands cuffed and legs shack[l]ed and their combined body weight on him was a greater level of force than reasonable officers would have used in 2013 and reasonable and trained officers would have known such restraint could result in serious injury or death. Their failure to follow the proper protocol to fulfill their responsibility for the safety of McBeth demonstrated a reckless disregard for the safety of McBeth.

(Tucker Report, ECF No. 87-28 at 10-12.)

## LEGAL STANDARDS

### Summary Judgment

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is

a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the Court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Under this standard, the existence of a mere scintilla of evidence in support of the non-moving party's position is insufficient to withstand a summary judgment motion. *Anderson*, 477 U.S. at 252. "Genuineness" of the disputed issue(s) "means that the evidence must create fair doubt; wholly speculative assertions will not suffice." *See Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

**Qualified Immunity**

In *Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892 (4th Cir. 2016), the Fourth Circuit Court of Appeals laid out the proper progression for qualified immunity analysis in cases alleging the use of excessive force by police officers:

> "Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). A "qualified immunity analysis," therefore, "typically involves two inquiries: (1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Raub v. Campbell*, 785 F.3d 876, 881 (4th Cir. 2015). The court "may address these two questions in 'the order... that will best facilitate the fair and efficient disposition of each case.'" *Id.* (alteration in original) (quoting *Pearson v. Callahan*, 555 U.S. 223, 242, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). [A plaintiff's] case survives summary judgment, however, only if we answer both questions in the affirmative. *See Pearson*, 555 U.S. at 232, 129 S. Ct. 808.
>
> In this case, we adhere to "the better approach to resolving cases in which the defense of qualified immunity is raised," that is, we "determine first whether the plaintiff has alleged a deprivation of a constitutional right at all." *Pearson*, 555 U.S. at 232, 129 S. Ct. 808 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S. Ct. 1708, 140 L.Ed.2d 1043 (1998)). Though this sequence is "no longer . . . regarded as mandatory," it is "often beneficial," and "is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Id.* at 236, 129 S. Ct. 808. Because excessive force claims raise such questions, *see* Nancy Leong, *Improving Rights*, 100 Va. L. Rev. 377, 393 (2014) ("[E]xcessive force claims are litigated over 98% of the time in the civil context . . . ."), [the adjudicating court may exercise its] discretion to address the constitutional question presented by [the case] first.

*Estate of Armstrong*, 810 F.3d at 898-99, *cert. denied sub nom. Vill. of Pinehurst, N.C.*

*v. Estate of Armstrong*, 137 S. Ct. 61, 196 L. Ed. 2d 32 (2016).

## DISCUSSION

### SCTCA and § 1983 Causes of Action Against Union County Sheriff's Office

At the outset, the Court notes that Plaintiff agrees with Defendant that the SCTCA causes of action for battery and negligence/gross negligence against the Union County Sheriff's Office ("UCSO") are barred by the Eleventh Amendment to the United States Constitution. (*See* Opp'n, ECF No. 87 at 1.) Accordingly, Plaintiff consents to the dismissal of the third and fourth causes of action in the complaint, and those claims are hereby dismissed. (*Id.*)

Moreover, Plaintiff agrees that he cannot maintain a § 1983 claim against the UCSO under a theory of municipal liability for failure to train, because such a claim is also barred by the Eleventh Amendment. (*See id.*) However, Plaintiff argues that he can maintain a § 1983 claim against Sheriff David Taylor ("Sheriff Taylor") individually as the chief policy maker for the UCSO for instituting a municipal policy and\or custom and practice that fails to train deputies in the appropriate procedures for taking mentally ill citizens into protective custody. (*Id.*) Accordingly, the Court will analyze Plaintiff's fifth cause of action with respect to Sheriff Taylor only.

### Causes of Action Against Brandon Vaughn

The Court notes that Plaintiff agrees to dismiss all claims against Defendant Brandan Vaughn because there is insufficient evidence for a jury to return a verdict against him under any cause of action. (*See id.*) Accordingly, all claims against Defendant Brandon Vaughn are hereby dismissed.

### Excessive Force Claim Against Childers, Hill, Johnson, and Suber

Plaintiff's first cause of action raises a claim under § 1983 and the South Carolina Wrongful Death Statute, S.C. Code § 15-51-10, et al., against Deputies Childers, Hill, Johnson, and Suber for the alleged application of unreasonable and excessive force in violation of McBeth's Fourth Amendment rights, leading to his death. (ECF No. 1 at 6-7.)

Defendants argue that the excessive force claim is fatally deficient because, "None of these Defendants even had any significant physical contact with McBeth, much less forceful contact." (ECF No. 69-1 at 11.) Instead, Defendants aver, "The only such contacts were minor and inconsequential." (*Id.*)

The Court finds that Plaintiff has established a genuine dispute of material fact as to whether the force used by Defendants Childers, Hill, Johnson, and Suber violated McBeth's Fourth Amendment right to be free from excessive force. "The Fourth Amendment governs claims of excessive force during the course of an arrest, investigatory stop, or other 'seizure' of a person." *Riley v. Dorton*, 115 F.3d 1159, 1161 (4th Cir. 1997) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010). Claims that law enforcement officers have used excessive force in the course of an arrest or other seizure are thus analyzed under the Fourth Amendment and its reasonableness standard. *See Graham*, 490 U.S. at 395. In determining whether the force used in the context of an arrest is reasonable under the Fourth Amendment, the Court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985) (stating that the question in

such cases is "whether the totality of the circumstances justified a particular sort of. . .seizure")). "The extent of the plaintiff's injury is also a relevant consideration." *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003) (citing *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994); *Pressly v. Gregory*, 831 F.2d 514, 517 (4th Cir. 1987)). Moreover, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. And the "reasonableness" inquiry in the context of the Fourth Amendment is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their intent or motivation." *Id.* at 397 (citing *Scott v. United States*, 436 U.S. 128, 137-139 (1978)).

In *Rowland v. Perry*, the officer defendant urged the court to take "a segmented view of the sequence of events," and to hold that each step taken by the officer was reasonable based on what the officer "knew at each point in this progression." 41 F.3d at 173. However, the Fourth Circuit declined to adopt such an approach to the reasonableness analysis, concluding that it "miss[es] the forest for the trees." *Id.* "The better way to assess the objective reasonableness of force," the *Rowland* court stated, "is to view it in full context, with an eye toward the proportionality of the force in light of all the circumstances." *Id.* Accordingly, "Artificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness." The Court will now address

each of the relevant factors in turn.

**Severity of the crime at issue.** It is undisputed that McBeth engaged in serious, violent felonies by assaulting a bystander and Officer Powers. Nonetheless, Plaintiff's excessive force claim challenges the actions taken by police *after* he had been subdued and handcuffed in a supine position. The question then becomes, what crime was McBeth committing, or at risk of committing, when he was laying on his back, shackled hand and foot?

Drawing all permissible inferences in favor of Plaintiff, as the Court is required to do, the restraints imposed by the remaining Defendants involved: (1) Deputy Suber laying on top of another police officer (Spencer), who was in turn laying on top of McBeth's torso while McBeth was in a prone position with his hands and feet shackled; (2) Deputy Johnson leaning on McBeth's legs/lower body and standing on the leg chains while McBeth was in a prone position with his hands and feet shackled, and while multiple officers were restraining his upper body in different ways; (3) Deputy Childers leaning over McBeth and putting additional pressure on his chest with her hands, after McBeth had already been subdued in a supine position, with his hands shackled and his neck in a choke hold;[11,12] and (4) Deputy Hill placing the leg irons on McBeth, then later assisting Sheriff Taylor in adjusting the way McBeth's legs were

---

[11] The Court has not seen any evidence to suggest that Deputy Childers applied pressure to McBeth's chest *after* Officer Hood released the choke hold, or while McBeth was in a prone position.

[12] With respect to use of the term "choke hold," Defendants spend fruitless time arguing that the hold applied by Officer Hood was merely to support and protect McBeth's head. There is a genuine dispute of material fact as to whether the hold was a "choke hold"—as Plaintiff claims—or a protective head restraint to keep McBeth from injuring himself—as Defendants assert. The nature of the head and neck restraint would certainly affect the factfinder's evaluation of the totality of the circumstances, regardless of the facts that Officer Hood is no longer a defendant in the lawsuit and that the remaining Defendants did not, themselves, apply any restraint to McBeth's head and neck. Accordingly, the Court adopts the term "choke hold," and finds that a reasonable juror could view Officer Hood's hold as operating on McBeth in the manner that Dr. Batalis defines as constituting a "choke hold," namely, "pressure placed around the outside of the neck that could obstruct the airway . . . or the blood vessels." (Batalis Dep. 33:21-25, ECF No. 87-8 at 14.)

shackled.[13]

In arguing that no constitutional violation occurred in this case (*see* Mot. for Summ. J., ECF No. 69-1 at 19; Reply, ECF No. 92 at 9), Defendants are essentially asking the Court: (a) to limit the extent of the restraints in question to those displayed in the cellphone video,[14] (b) to make a judgment call in Defendants' favor that the restraint Officer Hood was applying to McBeth's neck was reasonable and did not contribute to his difficulty breathing, and (c) to ignore the other factors that Plaintiff's expert has opined likely contributed to McBeth's sudden death after approximately sixteen (16) minutes in custody (*see* Batalis Report, ECF No. 87-27 at 6-8 ). But Fourth Circuit precedent counsels against making such "artificial divisions in the sequence of events," *see Rowland*, 41 F.3d at 17, and the Court is not at liberty to draw inferences in the moving parties' favor at summary judgment.

Here, there is little question that a reasonable juror could infer, from the palor of McBeth's skin in the cellphone video, from the foam coming out of the side of his mouth, from his sometimes labored and incoherent speech, from his general shortness of breath, and from the red/purple discoloration of Officer Hood's forearm, that the hold Hood was applying to McBeth's neck was impeding McBeth's respiration. It is undisputed that Deputies Suber, Johnson, and Childers applied no such neck hold to McBeth. However, their contemporaneous and subsequent applications of force to McBeth's body must be evaluated as part of a totality of circumstances that *includes*

---

[13] Sheriff Taylor is not named in the excessive force claim or the bystander liability claim.
[14] It would seem that Defendants want the Court to artificially curtail the scope of the seizure to the time period captured in the cellphone video—4 minutes and 6 seconds—when the actual duration of the seizure, and the corresponding force applied by numerous officers/deputies continues, albeit intermittently and with varying degrees of intensity, for a much longer period—approximately 16 minutes, from 2:00 to 18:00 of the Powers Video.

Officer Hood's choke hold. And the Court finds that there is a genuine issue of material fact as to whether the proportionality of the force that Suber, Johnson, and Childers each contributed (*see Rowland*, 41 F.3d at 173) to restraining McBeth was excessive, given that McBeth had already been substantially subdued and was in handcuffs and leg irons. Thus, the **severity of the crime** factor weighs against a finding of objective reasonableness under the circumstances presented.

At the same time, the Court is unwilling to illogically aggregate the Deputies' conduct with respect to the excessive force claim. It is clear that Defendants' liability, if any, under an excessive force theory must arise from actions that could be considered proximate causes of Plaintiff's injury. Otherwise, the excessive force claim would inevitably devolve into a quagmire of guilt-by-association. The Court declines Plaintiff's invitation to sloppily amalgamate the entirety of police conduct on the scene, and rule that by simply touching McBeth (referred to as "going hands-on"), however slightly, any officer or deputy becomes equally responsible for McBeth's resultant death. (*See* ECF No. 87 at 27-28 (arguing joint and several liability and "integral participation" theories).) Deputy Hill's conduct—putting the leg irons on McBeth initially, and later adjusting them with Sheriff Taylor—cannot be construed as a proximate cause of the restraint asphyxia allegedly suffered by McBeth. Moreover, there is no genuine dispute that the application of leg irons to McBeth was appropriate, given his aggressive and violent behavior immediately prior to being apprehended. Accordingly, though not directly related to the **severity of the crime** analysis, the Court takes this opportunity to grant summary judgment in favor of Deputy Hill *on the excessive force claim only*.

**Immediate threat to the safety of the officers or others.** Defendants argue

that the force applied to McBeth was reasonable because he continued to pose an immediate threat to the officers and deputies around him, even after he was on the ground and handcuffed. Defendants assert, "Aside from the danger posed by McBeth's possible use of the handcuffs as a weapon, there were other immediate threats to the police officers and others." (ECF No. 92 at 6.) They reference various statements made by the officers and deputies on scene: Deputy Vaughn – "When he was on the ground he was kicking and fighting trying to get up off the ground. He was trying to bite and spit on other officers." (Vaughn Statement, ECF No. 69-15 at 1); Officer Hood – "Sergeant Powers was able to place the subject in handcuffs at which time the subject continued to try and get up from the officers. While attempting to restrain the subject a white male informed the officers that the subject was attempting to grab one of their sidearms." (Hood Statement, *Id.* at 10.); Officer Spencer – "Jackie appeared to have super human strength, even while being held down he continued to somewhat manhandle fellow officers that were holding him down." (Spencer Statement, ECF No. 92-4 at 2).

The Court would note that these assertions appear to be one off statements, uncorroborated by numerous descriptions of the same incident by other officers. For example, while virtually every officer and deputy that provided a statement described McBeth as spitting up blood and saliva, none except Deputy Vaughn observed McBeth "trying to bite" anyone. And Vaughn himself acknowledged in his deposition that he does not even know whether McBeth spit at him intentionally.[15] (*See* Vaughn Dep. 20:1-2, ECF No. 87-12 at 7.) Similarly, no officer or deputy, other than Hood, described McBeth as attempting to take a police firearm. Furthermore, the video evidence does

---

[15] Also, the portions of Deputy Vaughn's deposition that are available to the Court include no reference to attempted biting.

not comport with McBeth being in a position to make such an attempt. Lastly, while it is true that McBeth continued to struggle against being restrained, the Court would be hard pressed to interpret the video evidence as showing anyone other than McBeth, himself, being "manhandled."

The cellphone video shows that once Officers Powers stood up and Officer Hood released his hold, McBeth took no aggressive action to assault the officers. (*See* Cellphone Video 3:07; ECF No. 87-30.) He continues to mutter, and sometimes yell, incoherent and bizarre statements. The officers and deputies on scene consistently describe McBeth as struggling and attempting to get up from the ground, including kicking his legs, but not as making any attempt to strike them. (*See* Powers Statement, ECF No. 87-21 at 6; Hood Statement, ECF No. 87-22 at 3; Suber Statement, ECF No. 87-23 at 2; Childers Statement, ECF No. 87-24 at 3; Johnson Statement, ECF No. 87-25 at 2-3.)

In *Estate of Armstrong*, the Fourth Circuit explained, "Even noncompliance with police directives and nonviolent physical resistance do not necessarily create 'a continuing threat to the officers' safety.'" 810 F.3d 892, 904 (citing *Meyers v. Baltimore Cty., Md.*, 713 F.3d 723, 733 (4th Cir. 2013)). Summarizing its relevant precedent on this point, the *Estate of Armstrong* court stated:

> In all of these cases, we declined to equate conduct that a police officer characterized as resistance with an objective threat to safety entitling the officer to escalate force. Our precedent, then, leads to the conclusion that a police officer may only use serious injurious force, like a taser, when an objectively reasonable officer would conclude that the circumstances present a risk of immediate danger that could be mitigated by the use of force. At bottom, "physical resistance" is not synonymous with "risk of immediate danger."

*Id.* at 905. Here, the Court finds that Plaintiff has presented a genuine issue regarding

whether McBeth's resistance to ongoing restraint merely constituted his efforts to get up from the ground and restore proper respiration, or whether there was truly an ongoing risk to officer and bystander safety. In conducting this analysis, it is important to remember that McBeth had already been subdued on the ground after being subjected to numerous Taser deployments and a choke hold, that he was already in handcuffs and leg irons, and that there were approximately five to six officers immediately surrounding McBeth, with many more on the scene. Given this context, the **immediate threat to safety** factor cuts against a finding of objective reasonableness.

**Actively resisting arrest.** For all the reasons already explained above, there is undoubtedly a genuine dispute regarding whether McBeth was actively resisting arrest once he was shackled and in the prone position. Defendants argue that McBeth's continuing movements were aggressive and that he could have broken free to begin injuring officers or bystanders at any moment. Plaintiff argues that McBeth was struggling to maintain his respiration, and the restraints being applied unreasonably restricted his ability to do so. Plaintiff's use of force expert, Mel Tucker, explained the concept of physiology of a struggle in his report:

> Because of the frequency of deaths [from positional asphyxia], law enforcement officers are taught in basic use of force training programs to avoid restraining people in a prone (face down) position and, if absolutely necessary to place in a prone position, to only do so for a very short time period. They are also taught that the basic physiology of a struggle and restraint of a person in a prone position is <u>a vicious cycle of suspect resistance and officer restraint</u> which can often result in the suspect's death because:
>
> 1. As suspect is restrained in a face-down position, breathing becomes labored, and the suspect struggles to get air;
> 2. In response to the suspect's struggle the officer applies weight to the person's back;
> 3. The more weight applied the more sever the degree of compression;

4. The greater the degree of compression of the suspect the greater the difficulty in breathing;
5. The natural reaction to oxygen deficiency is that the suspect struggles more violently;
6. In response to the increasingly violent struggle, the officer applies more compression to subdue the suspect (U.S. Department of Justice Bulletin dated June 1995 titled *Positional Asphyxia – Sudden Death* attached as Appendix H).

(Tucker Report, ECF No. 87-28 at 10.)

In *Rowland*, the Fourth Circuit found that "the resistance offered by [the arrestee] during the struggle with [police]," did not justify the use of force in question, reasoning that despite such resistance, the arrestee "posed no threat to the officer or anyone else." 41 F.3d at 173-74. It was relevant that the arrestee "resisted only to the extent of instinctively trying to protect himself from the defendant's onslaught." *Id.* at 174. More recently, in *Smith v. Murphy*, 634 F. App'x 914 (4th Cir. 2015), the Fourth Circuit stated, "As for the third *Graham* factor, resistance from [the arrestee] could be characterized as instinctive, and we have twice concluded that such reactions do not constitute active resistance." *Id.* at 917 (citing *Smith v. Ray*, 781 F.3d 95, 103 (4th Cir. 2015); *Rowland*, 41 F.3d at 174). Here, as was the case in *Smith v. Murphy*, the Court finds that when viewed in the light most favorable to McBeth, the facts could support a finding of excessive force, and the **resisting arrest** factor weighs against a finding of objective reasonableness.

**Extent of Plaintiff's Injuries.** Construing the facts in Plaintiff's favor, McBeth was Tased, choked, and placed in handcuffs and leg irons, yet still was subjected to ongoing restraint that compromised his ability to breath, leading to the ultimate injury— death. Accordingly, the Court finds that the **extent of injury** factor counsels toward a determination that the force used was disproportionate to the dangers presented.

**Failure to Intervene Claim Against Childers, Hill, Johnson, and Suber**

In order to succeed under a theory of bystander liability under § 1983, Plaintiff must demonstrate that Deputies Childers, Hill, Johnson, and Suber: (1) knew that a fellow law enforcement officer was violating McBeth's constitutional rights; (2) had a reasonable opportunity to prevent harm; and (3) chose not to act. *Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411, 419 (4th Cir. 2014) (citing *Randall v. Prince George's Cty., Md.*, 302 F.3d 188, 204 (4th Cir. 2002)). "The rationale underlying the bystander liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer." *Randall*, 302 F.3d at 204 n.24.

It is undisputed that Deputies Childers, Hill, Johnson, and Suber observed the choke hold that Officer Hood continued to apply after McBeth was handcuffed, with his lower body restrained by Officer Powers laying on him, and with multiple supporting officers in the immediate vicinity. Defendants simply deny that the head/neck restraint was a choke hold, and suggest that it was applied in order to keep McBeth from injuring his head on the ground. The choke hold is relevant to Plaintiff's survival claim for conscious pain and suffering. (*See* Compl. ¶ 19, ECF No. 1.)

It is clear that Defendants also observed a series of restraints applied by, at minimum, Officer Spencer, Deputy Suber, and Deputy Johnson, to McBeth after his hands and feet were shackled and he was laying in a prone position—though Defendants dispute the fact that McBeth was prone for any substantial period of time. The continuing restraints of pressure applied to McBeth's torso (back) and legs, with his hands cuffed under his stomach, thereby restricting his ability to breath, are relevant to

Plaintiffs wrongful death claim. (*See id.*) Defendants argue that these restraints were all necessary to ensure the safety of the officers and the public.

At bottom, Defendants assert that they are entitled to summary judgment on the bystander liability claim because they cannot be said to have known that a fellow law enforcement officer was violating McBeth's constitutional rights. The Court disagrees. Plaintiff has demonstrated a genuine issue of material fact by introduction of the cellphone video, the autopsy evidence,[16] the Powers Video, and the Deputies' statements. With respect to Defendants' alleged failure to intervene when observing the choke hold, the Court concludes that a reasonable jury could find that continued application of the choke hold after McBeth had already been substantially subdued in a supine position was a violation of McBeth's constitutional rights, and that Defendants knew or should have known as much. With regard to Defendants' alleged failure to intervene when observing two three-hundred-pound men (Officer Spencer and Deputy Suber) piled on top of McBeth while he lay on his stomach with his hands cuffed under him, the Court likewise finds that a reasonable jury could determine that McBeth's constitutional rights were being violated and that Defendants knew or should have known.

The remaining questions pertaining to bystander liability are easily resolved.

---

[16] In his report, Dr. Batalis opines: "While the choke hold depicted on the video was not the immediate cause of death, it certainly was a significant hold that impaired the decedent's ability to breath for a period of several minutes. While under the influence of the hold, the decedent was relatively calm and subdued with significant congestion of his head and neck (so called plethora). After release of the hold he did become agitated after several seconds, most likely as he was no longer starved of oxygen. Even then, however, he still appeared to be breathing rapidly as if he was out of breath. The extent of the pressure applied by the hold is also reflected in the substantial amount of hemorrhage in his neck in the area where the pressure of the hold was being applied as shown in this composite figure of a screen shot from the cellular phone video and an autopsy photo of the decedent's right side of his neck." (ECF No. 87-27 at 7.) The fact that Plaintiff's expert is able to make a direct link between the area of McBeth's neck where Officer Hood was applying the choke hold, and hemorrhage in the neck discovered during the autopsy, lends further weight to Plaintiff's theory that the choke hold was objectively unreasonable and precludes the entry of summary judgment.

Plaintiff has presented sufficient evidence to conclude that Deputies Childers, Hill, Johnson, and Suber had reasonable opportunities to prevent these harms—because they either remained in the immediate vicinity for the duration of the incident, or participated in the restraints themselves—and yet chose not to act—by failing to direct Officer Hood to release the choke hold sooner, and by failing to direct Officer Spencer and Deputy Suber to get off of McBeth's back and allow him an opportunity to breathe. *See Stevenson*, 743 F.3d at 419.

**Deputies Childers, Hill, Johnson, and Suber's Qualified Immunity Defense**

In the foregoing analysis (*supra* at 14-25), the Court found that, viewed in the light most favorable to Plaintiff, the record establishes that when seizing McBeth, Defendants used unreasonably excessive force and/or failed to intervene in violation of the Fourth Amendment. *See Brousseau v. Haugen*, 543 U.S. 194, 197 (2004) ("When confronted with a claim of qualified immunity, a court must ask first the following question: 'Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?'") (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The next inquiry is whether the constitutional right at issue was clearly established at the time Defendants acted. "A right satisfied this standard when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "'This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of the pre-existing law the unlawfulness must be apparent.'" *Wilson v. Layne*, 526 U.S. 603, 615

(1999) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Plaintiff asserts that it was clearly established in 2013, that using a choke hold and/or putting excessive pressure on a handcuffed prone subject exhibiting the risks/signs of sudden in-custody death, violated the Fourth Amendment. (ECF No. 87 at 30.)

Plaintiff introduced evidence to show that in order to receive certification as a law enforcement officer in South Carolina, a person must successfully complete the basic law enforcement training academy run by the South Carolina Criminal Justice Academy (SCCJA). At the time of this incident, the SCCJA was and had been teaching students about sudden in-custody deaths in three different areas of instruction, the training sections on: (1) use of force, (2) use of chemical spray, and (3) civil liability. Each section discussed the dangers of sudden in-custody death syndrome ("SIDS"), specifically referencing positional asphyxia as a primary cause and discussing how to mitigate it. For example, the Use of Force Lesson Plan describes positional asphyxia in the following manner:

> Positional Asphyxia – A lack of oxygen and increase in carbon dioxide in the blood of the subject, brought about by a subject being in a position that restricts breathing. This condition can lead to death. *Caution should be exercised when restraining or cuffing a subject in a prone position. A subject's own body weight, along with any weight applied by an officer, may restrict the subject's ability to catch his/her breath. The subject may increase his/her struggle, which may appear to the officer as an increase in resistance to the arrest. For this reason, a subject should not be positioned and transported on his/her stomach or on his/her back in a prone position.* A subject should be transported in an upright seated position with the head off the chest to assure that an airway is open.

(ECF No. 87-38 at 7 (emphasis added).) (*See also* Civil Liability Lesson Plan, ECF No. 87-39 at 11;[17] Chemical Spray Lesson Plan, ECF No. 87-37 at 10.) In identifying the risk

---

[17] The Civil Liability Lesson Plan also specifically references the dangers of "carotid holds," another descriptor for the type of hold allegedly applied by Officer Hood, in a section entitled, "Positional

factors for SIDS, the Use of Force Lesson Plan cautions, "If an officer notes any of the following risk factors present, then extreme caution and close observation should be used with the subject." (ECF No. 87-38 at 6.) The risk factors are listed as: (a) heavy alcohol intoxication, (b) extraordinary physical strength, (c) poor color, (d) panic, (e) hyperthermia – red face and high body temperature, (f) sudden tranquility or lethargy, (g) paranoia, (h) cocaine intoxication, (i) obesity – large bellies, (j) aggressive or bizarre behavior, (k) apparent ineffectiveness of chemical spray. (*Id.*) In his opposition, Plaintiff also itemizes deposition testimony from Deputies Childers, Hill, Johnson, and Suber, reflecting their recollections about being trained on positional asphyxia at the SCCJA at various points from 1998 to 2004. (*See* ECF No. 87 at 16-18.)

There is no Fourth Circuit precedent that considers positional asphyxia in the context of a claim alleging that an arrestee's Fourth Amendment rights were violated

---

Asphyxia, Excited Delirium, Carotid Holds." Also, the description of "excited delirium" rings eerily true to McBeth's condition as he was being taken into custody. It reads:

> In using force, officers need to be aware of concerns relating to positional asphyxia, particularly as it relates to excited delirium and carotid holds. Medical and law enforcement studies have cautioned officers in their use of certain techniques and many departments prohibit hogtying. Excited delirium syndrome is described as involving "delirium or psychosis, *violent behavior, superhuman strength, dilated pupils*, paranoia, *hallucinations*, hyperthermia, undressing in public, hiding behind cars, buses or trees, hearing voices, high blood pressure and pulse rate, *aggression toward objects, especially glass, thrashing after restraint*, jumping into water, *yelling*, and self-inflicted injury." (Dr. Wetli of Dade County, Florida, <u>Final Report of the Custody Death Task Force</u>) In some cases, following restraint of such individuals in a prone position, with weight on their backs, in-custody deaths have occurred. Positional asphyxia relates to a situation when the position of the body interferes with respiration resulting in asphyxia.

> Where there are dangers of positional asphyxia, the officers should attempt to quickly control the suspect then relieve him/her of heavy weight meant to keep him/her controlled and get him/her out of the prone position as soon as possible. The suspect should be monitored continuously while there is any danger and officers should provide immediate medical attention as necessary.

(ECF No. 87-39 at 11 (emphasis added).)

during the course of the seizure.[18] In *Meyers v. Baltimore Cty., Md.*, 713 F.3d 723 (4th Cir. 2013), the Fourth Circuit stated:

> We . . . have stated in forthright terms that "officers using unnecessary, gratuitous, and disproportionate force to seize a **secured, unarmed citizen**, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity." *Bailey v. Kennedy*, 349 F.3d 731, 744-45 (4th Cir.2003) (quoting *Jones v. Buchanan*, 325 F.3d 520, 531-32 (4th Cir. 2003)). The fact that the force used in the present case emanated from a taser, rather than from a more traditional device, is not dispositive. The use of **any "unnecessary, gratuitous, and disproportionate force,"** whether arising from a gun, a baton, a taser, or other weapon, precludes an officer from receiving qualified immunity **if the subject is unarmed and secured**. *See Park*, 250 F.3d at 852–53 (concluding that an officer's use of "pepper spray" to subdue an unarmed subject was irresponsible and excessive when the subject was not a threat to the officer or the public, and that the officer was not entitled to qualified immunity); *see also Orem v. Rephann*, 523 F.3d 442, 449 (4th Cir.2008) (concluding that use of a taser to "punish or intimidate" a pretrial detainee is not objectively reasonable and is contrary to clearly established law).

*Id.* at 734-35 (emphasis added). Thus, the *Meyers* court concluded that, where the arrestee was unarmed and "effectively was secured with several officers sitting on his back," seven additional Taser shocks administered by an arresting officer were "unnecessary, gratuitous, and disproportionate." *Id.* at 735 (citing *Bailey*, 349 F.3d at 744-45).

In *Champion v. Outlook Nashville Inc.*, 380 F.3d 893 (6th Cir. 2004), the Sixth Circuit Court of Appeals held, "it is . . . clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." *Id.* at 903. Accordingly, the Sixth Circuit denied qualified immunity to officers who, in 1999,

---

[18] Defendants' extensive citation to and discussion of Fourteenth Amendment cases in the motion for summary judgment is inapposite. (*See* ECF No. 69-1 at 13-19.) The deliberate indifference standard has relevant, indeed essential, differences, and the cases cited by Defendants are neither controlling, nor persuasive.

placed their weight upon the arrestee's body by lying across his back and simultaneously pepper sprayed him. *Id. See also Martin v. City of Broadview Heights*, 712 F.3d 951 (6th Cir. 2013) ("A reasonable officer should have known that subduing an unarmed, minimally dangerous, and mentally unstable individual with compressive body weight, head and body strikes, neck or chin restraints, and torso locks would violate that person's clearly established right to be free from excessive force."); *Simpson v. Hines*, 903 F.2d 400 (5th Cir. 1990) (denying qualified immunity to police officers who entered an inmate's cell, placed the inmate in a neck hold, and put strong pressure upon his chest, where the custodial death report attributed the inmate's death to asphyxia as a result of trauma to the neck sustained during the struggle, and a physician's report suggested that the inmate may have died as a result of asphyxiation due to the pressure on his chest). In *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008), the Tenth Circuit Court of Appeals reversed the district court's grant of qualified immunity for an in-custody death due to positional asphyxiation occurring in 2002. *Id.* at 1155. The Tenth Circuit stated, "If . . . the facts plaintiffs proffered are true and the jury draws the inferences most supportive of plaintiffs' position, then the law was clearly established that applying pressure to [the arrestee's] upper back, once he was handcuffed and his legs restrained, was constitutionally unreasonable due to the significant risk of positional asphyxiation associated with such actions." *Id.* The *Weigel* court further explained:

> We do not think it requires a court decision with identical facts to establish clearly that it is unreasonable to use deadly force when the force is totally unnecessary to restrain a suspect or to protect officers, the public, or the suspect himself. Yet, as explained above, there is evidence that this is what happened here: even after it was readily apparent for a significant period of time (several minutes) that [the arrestee] was fully restrained and posed no danger, the defendants continued to use pressure on a vulnerable person's upper torso while he was lying on his stomach. A

reasonable officer would know these actions present a substantial and totally unnecessary risk of death to the person.

*Id.* at 1154.

The dangers of positional asphyxia and its potential to cause sudden in-custody death has been taught at the SCCJA since the late 1990s. (*See* ECF No. 87-36 at 2.) The Court finds that, given the conditions that McBeth was unarmed and already secured with handcuffs and leg irons, any reasonable officer would have known that the continued application of a choke hold and the piling of two three-hundred-pound officers on McBeth's torso while he was in the prone position were unnecessary, gratuitous, and disproportionate forms of force to prevent a risk of injury to the officers or the public. *See Meyers*, 713 F.3d at 735. Accordingly, the Court holds that the use of a choke hold and/or excessive pressure on a handcuffed, prone subject exhibiting risk factors for sudden in-custody death violated McBeth's clearly established Fourth Amendment right to be free from excessive force.

### Failure to Train § 1983 Claim Against Sheriff Taylor

As indicated above, the parties dispute whether the complaint asserts a § 1983 claim for failure to train against David Taylor in his individual capacity. (*See supra* at 2.) Defendants maintain that paragraph 6 of the complaint specifically states that Taylor is sued "in his representative capacity for the Office of the Union County Sheriff," and nowhere does the complaint expressly indicate that Taylor is sued in his individual capacity. (*See* ECF No. 92 at 10-11.) Plaintiff counters that the same paragraph of the complaint states, further down, "David Taylor is *also* sued under 42 U.S.C. § 1983 for compensatory damages for having a municipal policy and/or custom and practice that fails to train deputies in the appropriate procedures for taking mentally ill citizens into

protective custody that proximately caused Jackie McBeth's death." (*See* ECF No. 94 at 1-2 (emphasis added).) It is true, Plaintiff concedes, that paragraph 6 contains the "representative capacity" language, precisely because state law claims under the South Carolina Tort Claims Act, require a claimant to sue the entity (here the UCSO), not the individual. But the word "also," asserts Plaintiff, indicates that Taylor is being sued in a different capacity for the § 1983 claim—namely, his individual capacity. (*See id.* at 2.)

The Court finds that the complaint does, indeed, state a claim against Taylor in his individual capacity for violation of § 1983, pursuant to a failure to train theory. The proper way to plead a § 1983 claim against the UCSO as an entity, would be to sue Taylor "in his official capacity." The complaint does not include any "official capacity" reference, just as it does not include any "individual capacity" reference. Nevertheless, in the view of the undersigned, a fair reading of paragraph 6 indicates a progression from a representative capacity claim under the SCTCA—explicitly seeking compensatory damages from the UCSO ("The Office of the Union County Sheriff is sued for compensatory damages under

state law based on the acts and omissions of their deputies in the seizure of the deceased

plaintiff, Jackie McBeth")—to an individual capacity claim under § 1983—seeking compensatory damages from David Taylor ("David Taylor is also sued under 42 U.S.C. § 1983 for compensatory damages for having a municipal policy . . . ."). (*See* Compl. ¶ 6, ECF No. 1.) Moreover, David Taylor is named in the caption the same way all of the Defendant Deputies are named, simply by first and last name, and the Defendant Deputies are indisputably all sued in their individual capacities.

Defendants argue that Plaintiff "should not be allowed to raise a new individual capacity claim against Defendant Taylor at this late stage of the case, well over two years after the Complaint was filed, after extensive discovery has been completed, and when a motion for summary judgment is already pending before this Court." (ECF No. 92 at 10.) But Defendants would be hard pressed to demonstrate any prejudice from a determination that the complaint states an individual capacity claim, given that both Taylor and the police procedure experts in this case were questioned extensively at their depositions regarding Taylor's training and supervision of his deputies, and that numerous documents were exchanged during discovery regarding Taylor's training and supervision policies specifically. To preclude the individual capacity claim at this stage for failure to include the talismanic words in the original pleading, would be to elevate form over substance, and the Court declines to do so.[19] *See Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411, 418 (4th Cir. 2014) (upholding the sufficiency of a § 1983 claim for bystander liability where the phrase "bystander liability" appeared nowhere in the complaint, and stating that the plaintiffs "were not required to use any precise or magical words in their pleading").

Those rather technical matters being resolved, the Court has little difficulty in denying the motion for summary judgment on the failure to train claim. In order to

---

[19] At the same time, the Court will not rewrite Plaintiff's complaint in order to expand the scope of liability. In his opposition, Plaintiff writes, "Aside from being individually liable for his actual physical participation and under a theory of bystander liability, Sheriff Taylor can also be held responsive to a verdict under a theory of supervisory liability." (ECF No. 87 at 33.) However, David Taylor is not named in the excessive force cause of action or the bystander liability cause of action. (*See* Complaint ¶¶ 15-19, ECF No. 1 at 6-7.) This was clearly an intentional choice, given that each of the other individual Defendants is referenced by name in both claims. (*See id.*) Thus, the parties will note that the Court has analyzed the viability of those claims without reference to Taylor's putative liability under either theory. (*Supra* at 14-31.) Admittedly, the subtitle of the fifth cause of action states that it is for "Municipal Liability against the City of Union and *the Union County Sheriff's Office* . . . ." (ECF No. 1 at 9 (emphasis added).) However, the substance of the claim names David Taylor specifically, and itemizes various alleged acts and omissions that form the basis of the claim. (*See id.* at 10-13.)

maintain a claim for supervisory liability under § 1983, "A plaintiff must show actual or constructive knowledge of a risk of constitutional injury, deliberate indifference to that risk, and an 'affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.'" *Carter v. Morris*, 164 F.3d 215, 221 (4th Cir. 1999) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)). Moreover, with respect to failure to train claims specifically:

> To impose liability on a supervisor for the failure to train subordinates, a plaintiff must plead and prove that: (1) the subordinates actually violated the plaintiff's constitutional or statutory rights; (2) the supervisor failed to train properly the subordinates thus illustrating a "deliberate indifference" to the rights of the persons with whom the subordinates come into contact; and (3) this failure to train actually caused the subordinates to violate the plaintiff's rights. *Harris*, 489 U.S. at 388-92, 109 S.Ct. 1197; *see also Doe v. Broderick*, 225 F.3d 440, 456 (4th Cir. 2000); *Carter v. Morris*, 164 F.3d 215, 221 (4th Cir.1999); Anthony D. Schroeder, *Note, The Deliberate Indifference Standard in 42 U.S.C. § 1983 Municipal Liability Failure to Train Cases*, 22 U. Tol. L.Rev. 107, 126 (1990).

*Brown v. Mitchell*, 308 F. Supp. 2d 682, 701-02 (E.D. Va. 2004).

Plaintiff has introduced sufficient evidence to create a genuine dispute of material fact regarding David Taylor's alleged failure to properly train his deputies regarding the dangers of positional asphyxia. Taylor was the chief policy maker for the UCSO. A reasonable policy maker, given the available literature that positional asphyxia is one of the chief causes of sudden in-custody death, should develop a policy and training on the topic. Such training should include education on the physiology of struggle, and make officers aware that an arrestee's attempts to get up and/or get officers off of them while they are in a prone position may be an effort to facilitate breathing rather than resistance. The need for such training is demonstrated by the fact that positional asphyxia is taught at the basic law enforcement training academy at the SCCJA. In this

case, there were numerous Sheriff's Deputies at the scene of the struggle and none of them recognized the presence of many of the risk factors that SCCJA training lists as indicators for an elevated danger of SIDS—e.g., McBeth was a large man with a fairly large belly, his face was discolored, he was acting in a panic, he exhibited moments of sudden tranquility immediately following aggressive and bizarre behavior, apparent ineffectiveness of chemical spray, he had been tased numerous times and subject to attempted chemical spray, at times he appears to be gasping for air, etc. (*See* Use of Force Lesson Plan, ECF No. 87-38 at 6.)

The Court finds that Sheriff Taylor was on actual and constructive notice regarding the dangers of positional asphyxia in the course of Fourth Amendment seizures made by his deputies. It is immaterial that there had been no prior instances of positional asphyxia during Taylor's tenure as Sheriff at the UCSO, because the nature of the resultant harm—sudden death—required preemptive training measures to fulfill the demands of reasonableness. There is sufficient evidence of deliberate indifference to that risk to survive summary judgment because Sheriff Taylor had no training policy on this topic. Taylor was even at the scene observing the restraints being applied to McBeth, and himself failed to identify the presence of risk factors for positional asphyxia. Moreover, there is sufficient evidence for a reasonable jury to conclude that this failure to train proximately caused Taylor's subordinates to violate McBeth's Fourth Amendment right to be free from excessive force. Accordingly, the motion for summary judgment with respect to the failure to train claim is denied.

## CONCLUSION

After careful consideration of the parties' briefs and the relevant portions of the

record, and for the reasons set forth above, the Court grants in part and denies in part Defendants' Motion for Summary Judgment (ECF No. 26). The third and fourth causes of action in the complaint are dismissed. The § 1983 claim against the Union County Sheriff's Office under a theory of municipal liability for failure to train is also dismissed; however, the failure to train claim against David Taylor in his individual capacity survives. All claims against Brandon Vaughn are dismissed. The excessive force claim against Roger Hill is dismissed; however, the excessive force claim against Wendy Childers, James Johnson, and Roger Suber persists. The bystander liability claim against Wendy Childers, Roger Hill, James Johnson, and Roger Suber survives.

**IT IS SO ORDERED.**

       /s/ Bruce Howe Hendricks
      Bruce Howe Hendricks
      United States District Judge

September 25, 2018
Greenville, South Carolina